UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRANCE BELCHER,

                Petitioner,                            Hon. Gordon J. Quist

v.                                               Case No. 1:12-CV-504

MARY BERGHUIS,

                Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Belcher's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Belcher's petition be **denied**.

**BACKGROUND**

        As a result of events which occurred on or about May 14, 2008, Petitioner was charged with the following crimes: (1) first degree criminal sexual conduct involving an accomplice; (2) third degree criminal sexual conduct involving force or coercion; (3) aggravated domestic

1

violence; and (4) unlawful imprisonment.  (Trial Transcript, June 29, 2009, 21, 30).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

**Dana Herman**

As of May 14, 2008, Herman was dating Petitioner.  (Trial Transcript, June 30, 2009, 34-37).  That afternoon, Herman and Petitioner began arguing after Petitioner accused Herman's son of stealing money from his wallet.  (Tr. 37-38).  Herman subsequently called the police requesting that Petitioner be removed from her property.  (Tr. 38-40).  The police, however, did not respond to Herman's request.  (Tr. 41-44).

Early that evening, Petitioner telephoned Herman indicating that he wanted to speak with her.  (Tr. 45).  Herman agreed and Petitioner arrived at Herman's residence shortly thereafter.  (Tr. 45-46).  When Petitioner arrived, Herman sat down in the front seat of his vehicle at which point she noticed that there was another man, whom she did not recognize, sitting in the back seat.  (Tr. 45-46).  Herman told Petitioner that she "didn't want to go anywhere."  (Tr. 46).  Petitioner ignored this request, however, and began driving, telling Herman, "[w]ell, I just wanted you to go with me to drop him off."  (Tr. 46-47).

Petitioner drove to Minnie McMurtry's house.  (Tr. 46-48).  When he arrived, Petitioner asked Herman and the man riding in the back seat to exit the vehicle and come inside the house.  (Tr. 47).  Herman and the man did as Petitioner requested and entered the residence and sat down in the living room.  (Tr. 47-49).  Petitioner "told the other man to go upstairs."  (Tr. 50).  After the other man exited the room, Petitioner asked Herman if she thought he "was going to let [her] get

2

away with this."  (Tr. 50).  Petitioner then told Herman to "take off all [her] clothes" and "go upstairs."  (Tr. 50-53).  Petitioner threatened to beat Herman if she did not comply with his demands.  (Tr. 52-53).  The door to McMurtry's residence locked and unlocked, from both the inside and outside, by use of a key.  (Tr. 110-11).  Herman could not flee because Petitioner locked the entrance door and kept the key.  (Tr. 68).

Despite her fear, Herman did as she was instructed and entered an upstairs bedroom.  (Tr. 53-55).  When Herman entered this room, she observed the other man standing naked at the foot of a bed.  (Tr. 55).  Petitioner then entered the room and sexually penetrated Herman, against her wishes, with a beer bottle.  (Tr. 56-59).  When Herman complained that this was causing pain, Petitioner refused to stop and simply continued his assault.  (Tr. 104).  After violating Herman with a beer bottle, Petitioner instructed the other man to rape Herman.  (Tr. 56-59).  After raping Herman, the other man went downstairs.  (Tr. 58).  Petitioner then physically assaulted Herman with an electrical cord and repeatedly beat her with a wire hanger.  (Tr. 59-64).

Petitioner later instructed Herman to get dressed and go downstairs.  (Tr. 70).  Petitioner, Herman, and the other man then exited the residence and got into Petitioner's vehicle.  (Tr. 70).  Petitioner drove away and "dropped [the other man] off somewhere around the corner" after which he "went to pick up Minnie" from work.  (Tr. 70).  After picking up Minnie, Petitioner drove her home.  (Tr. 71-73).  Herman did not say anything to Minnie about what had happened to her because she "was scared" of what Petitioner might do.  (Tr. 72-73).  Petitioner later dropped Herman off at her residence at which point she ran inside and told her mother what happened earlier that evening.  (Tr. 74-76).

**Doris Herman**

Doris Herman is Dana Herman's mother.  (Trial Transcript, June 30, 2009, 118-19).  As of May 14, 2008, Dana Herman resided with her mother.  (Tr. 119-22).  That morning, Petitioner and Dana Herman began arguing after Petitioner accused Herman's son of stealing fifty dollars from him.  (Tr. 122-23).  In the course of this argument, Petitioner threatened Doris Herman.  (Tr. 124).  Doris Herman eventually told Petitioner to leave.  (Tr. 124-25).  Petitioner later returned to Herman's residence requesting that Dana Herman "get his money."  (Tr. 127-28).  Dana Herman eventually contacted the police, but by the time the police arrived Herman had already departed to do some shopping.  (Tr. 128-29).

At approximately 11:00 p.m., one of Dana Herman's children woke up Doris Herman to report that Dana Herman was "not at home."  (Tr. 130).  When Doris Herman asked where Dana Herman was, the child responded that Dana Herman "left with Terry."  (Tr. 130).  Dana Herman returned home approximately one hour later.  (Tr. 133).  When Herman entered the house she was "shaking" and "tears [were] rolling down her face."  (Tr. 138).  Doris Herman also noticed that her daughter had bruises and scratches consistent with having been slapped and choked.  (Tr. 133-35).

**Shannon Brauning**

Brauning is a certified nurse examiner and was permitted to testify as an expert in the field of "nurse examination dealing with the victims of sexual assault."  (Trial Transcript, June 30, 2009, 158-63).  At approximately 3:00 a.m. on May 15, 2008, Brauning was contacted by the Grand Rapids Police Department to examine Dana Herman.  (Tr. 164).  Herman informed Brauning that Petitioner sexually assaulted her with a beer bottle, after which Petitioner forced her to have sex with

4

another man named Marcellus. (Tr. 167-68). Petitioner subsequently punched Herman with his fist and beat her with a wire hanger. (Tr. 167-68).

Brauning's examination of Herman revealed the presence of various injuries. (Tr. 169). Specifically, Brauning observed that Herman had scratches on her face, bruises on her neck, bruises on her buttocks, and a laceration on her pelvis. (Tr. 169-75). Herman's injuries were consistent with her description of events. (Tr. 174). Using slides and swabs, Brauning collected potential DNA evidence from Herman's vaginal area. (Tr. 175-76, 179-80). A vaginal examination did not reveal evidence of injury which Brauning did not find unusual under the circumstances. (Tr. 175-78).

**Robert Wiersema**

As of May 14, 2008, Wiersema was employed as a police officer with the Grand Rapids Police Department. (Trial Transcript, June 30, 2009, 187-88). At approximately 11:50 p.m. that evening, Officer Wiersema was dispatched to investigate a claim that a woman had been sexually assaulted. (Tr. 188-89). Wiersema spoke with Dana Herman. (Tr. 189). Wiersema immediately observed that Herman "had some bruising on her face." (Tr. 189). Herman "was upset," but was "reluctant" to describe what happened to her. (Tr. 189-91). Herman eventually spoke with Officer Wiersema, explaining that she "had been raped by Terrance Belcher and another gentleman that she referred to as Marcellus." (Tr. 190-91). Shortly thereafter, Officer Wiersema effected a traffic stop on Petitioner and took him into custody. (Tr. 193-95).

**Kevin Snyder**

As of May 14, 2008, Snyder was employed as a police officer with the Grand Rapids Police Department. (Trial Transcript, June 30, 2009, 205-06). Sometime that evening, Snyder assisted Officer Wiersema stop and detain Petitioner. (Tr. 206-07). Once Petitioner was detained, he was placed in the rear of Officer Snyder's squad car. (Tr. 207-08). Snyder observed that Petitioner "had an injury to his right hand, on his finger, that was bleeding pretty good." (Tr. 210). Snyder discerned that the injury was "pretty fresh." (Tr. 210). Petitioner stated that he injured his finger playing basketball earlier in the day. (Tr. 210).

**Minnie McMurtry**

McMurtry began dating Petitioner in March 2008. (Trial Transcript, June 30, 2009, 219-20). McMurtry allowed Petitioner to drive her car and every day Petitioner would drive McMurtry to and from her various jobs. (Tr. 222-25). As of May 14, 2008, McMurtry was residing at 1136 Cooper Avenue. (Tr. 223). According to McMurtry, a key was required to lock or unlock the entrance door to her residence. (Tr. 242).

On that particular afternoon, Petitioner picked up McMurtry from one of her jobs. (Tr. 225-26). Petitioner told McMurtry that before driving her to her other job he had to stop at Dana Herman's residence "because he had some money that was came up missing." (Tr. 225). Petitioner then drove to Herman's residence where he exited the vehicle and spoke with Herman. (Tr. 226). Petitioner and Herman subsequently got into Petitioner's vehicle at which point Petitioner asked Herman "what was she going to do about that little boy taking his money?" (Tr. 227-28). Herman responded that she "was going to call the police." (Tr. 228). The trio waited for approximately one

6

hour for the police, but they never arrived.  (Tr. 228).  Petitioner subsequently drove McMurtry to her other job.  (Tr. 229).

Petitioner picked up McMurtry from this job at approximately 10:00 p.m.  (Tr. 229-30).  After entering the vehicle, McMurtry realized that Dana Herman was riding in the back seat.  (Tr. 230-31).  McMurtry observed that "something [was] wrong" with Petitioner's finger as he had it wrapped up in a towel.  (Tr. 235-37).  Petitioner proceeded to drive McMurtry home.  (Tr. 231-32).  As Petitioner was driving, he kept asking Herman what she was going to do to get him money.  (Tr. 231-32).  After taking McMurtry home, Petitioner and Herman drove away.  (Tr. 233).  Upon entering her home, McMurtry did not observe anything unusual in the upstairs bedrooms because her bedroom was in the basement.  (Tr. 235).  The following morning, police executed a search warrant at her residence.  (Tr. 234-35).

**Pamela McGill**

As of the time of Petitioner's trial, McGill was married to Petitioner's brother.  (Trial Transcript, June 30, 2009, 247).  Following his arrest, Petitioner telephoned McGill "a number" of times.  (Tr. 248).  During one of these conversations, McGill asked Petitioner, "what about that other guy?"  (Tr. 251-52).  When asked how she learned that a second man had been involved in the assault of Dana Herman, McGill responded, "you know, a lot of people was talking about that, I mean I hear it, I know people."  (Tr. 252).

**Rona Ghee**

As of May 2008, Ghee associated with Petitioner, Minnie McMurtry, and Dana

Herman.  (Trial Transcript, June 30, 2009, 256-58).  One night during this general time frame, Ghee did not recall the exact date, Petitioner and Dana Herman visited Ghee at her residence.  (Tr. 258-59).  Herman was "happy" and did not appear "scared" or injured.  (Tr. 264-66).  Rather, Petitioner and Herman acted "like they was dating."  (Tr. 264).

**Tanya Diekema**

Diekema met Petitioner in "the summer" of 2008.  (Trial Transcript, July 1, 2009, 16).  Diekema was unsure whether she met Petitioner before May 14, 2008, but conceded that she could have.  (Tr. 16-17).  On one occasion, shortly after the pair met, Petitioner arrived at Diekema's residence "with his hand bleeding."  (Tr. 18-19).  Diekema provided Petitioner "a band-aid and a towel."  (Tr. 19).

**Brian Reed**

As of May 15, 2008, Reed was employed as a crime scene technician with the Grand Rapids Police Department.  (Trial Transcript, July 1, 2009, 26-27).  On May 15, 2008, Reed participated in a search of Minnie McMurtry's residence.  (Trial Transcript, June 30, 2009, 223; Trial Transcript, July 1, 2009, 27).  As part of this search, the following items were recovered from a bedroom: a beer bottle, a hanger, and a length of cord.  (Trial Transcript, July 1, 2009, 29-32).  From a bathroom, officers recovered a wash cloth "with stains on it, red stains."  (Tr. 32-33).

**Gregory Griffin**

As of May 15, 2008, Griffin was employed as a police officer with the Grand Rapids

Police Department. (Trial Transcript, July 1, 2009, 36-37). Early that morning, Griffin participated in detaining Petitioner. (Tr. 37-38). After Petitioner was detained, Griffin recovered, from inside Petitioner's vehicle, "a towel that appeared to have blood on it." (Tr. 39-40). Later that morning, Griffin participated in the search of Minnie McMurtry's residence. (Tr. 40-41). As part of the search of the upstairs bedrooms and bathroom, Griffin recovered a beer bottle, several wire hangers, and a stained washcloth. (Tr. 41-47).

**Richard Lewis**

As of May 15, 2008, Lewis was employed as a detective with the Grand Rapids Police Department. (Trial Transcript, July 1, 2009, 49). Lewis interviewed Dana Herman following her initial medical examination and subsequently assisted in the processing of various items recovered following the search of the crime scene. (Tr. 49-56).

**Joel Schultze**

Schultze, in his capacity as supervisor of the DNA unit of a Michigan State Police forensic laboratory, testified regarding the results of forensic testing performed on several items of evidence recovered during the search of Minnie McMurtry's residence. (Trial Transcript, July 1, 2009, 70-73). Examination of the beer bottle revealed a semen sample. (Tr. 75). DNA testing of this sample excluded Petitioner, but matched the DNA profiles of Dana Herman and Roderick Marzette. (Tr. 75-84). DNA testing of the vaginal swab obtained during Dana Herman's initial medical examination excluded Petitioner, but matched the DNA profile of Roderick Marzette. (Tr. 79-84). Examination of the washcloth revealed the presence of blood which matched Petitioner's

9

DNA profile.  (Tr. 79-84).

**Paula Crawford**

Crawford met Petitioner on August 31, 1986.  (Trial Transcript, July 1, 2009, 89-90). On this particular evening, Crawford exited a bar and began "looking for a ride home" when she was approached by Petitioner who offered to give her a ride.  (Tr. 90).  Crawford initially accepted, but when she observed that two additional men would be accompanying them, Crawford declined.  (Tr. 90-91).  Petitioner assured Crawford "it would be all right," so she agreed to get in the car with the three men.  (Tr. 91).  Petitioner and Crawford were sitting in the rear seat of the vehicle while the other two men rode in the front seats.  (Tr. 91).  Petitioner began trying to persuade Crawford to attend a party with the three men, but Crawford declined, requesting instead that she be driven home. (Tr. 91-92).  The men ignored Crawford's request and drove to a location that was unfamiliar to Crawford.  (Tr. 92-93).  Petitioner assured Crawford that everything was "all right," so Crawford and the three men exited the vehicle and began walking.  (Tr. 93, 100).  After reaching a secluded location, the three men, including Petitioner, sexually assaulted Crawford.  (Tr. 93-97).

Following the presentation of evidence, the jury found Petitioner guilty of (1) first degree criminal sexual conduct involving an accomplice; (2) third degree criminal sexual conduct involving force or coercion; (3) aggravated domestic violence; and (4) unlawful imprisonment. (Trial Transcript, July 2, 2009, 82-83).  Petitioner was sentenced, as an habitual felon, to serve 45-90 years on the first degree criminal sexual conduct conviction and lesser terms of imprisonment on the other convictions.  (Sentencing Transcript, July 23, 2009, 13-14).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

10

I.     Was there sufficient evidence proven by the prosecution beyond a reasonable doubt that Defendant was guilty of criminal sexual conduct, first degree (accomplice); criminal sexual conduct, third degree; aggravated domestic violence and unlawful imprisonment?

II.    Was the Defendant juror member #12 bias against the Defendant at his jury trial on June 29, 2009 to July 2, 2009 on the charges of criminal sexual conduct, first degree - accomplice; criminal sexual conduct, third degree; aggravated domestic violence and unlawful imprisonment?

III.   Was the Defendant trial counsel ineffective assistance of counsel?[1]

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Belcher*, 2010 WL 5383948 (Mich. Ct. App., Dec. 28, 2010). Asserting the same issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Belcher*, 797 N.W.2d 633 (Mich. 2011). Petitioner subsequently advanced in state court various post-conviction motions for relief, none of which presented claims which are asserted in the present action. (Dkt. #24-27). Asserting the same three issues identified above, Petitioner initiated the present action on May 17, 2012.

**STANDARD OF REVIEW**

Belcher's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

---

[1] Issue I was asserted by Petitioner's appellate counsel whereas issues II and III were asserted by Petitioner in a supplemental brief. (Dkt. #23).

> (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim —
>
>    (1)  resulted in a decision that was contrary to, or involved
>         an unreasonable application of, clearly established
>         Federal law, as determined by the Supreme Court of
>         the United States, or
>
>    (2)  resulted in a decision that was based on an
>         unreasonable determination of the facts in light of the
>         evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable

application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly

established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

14

# ANALYSIS

## I.        Sufficiency of the Evidence

Petitioner asserts that there did not exist sufficient evidence to convict him of (1) first degree criminal sexual conduct involving an accomplice; (2) third degree criminal sexual conduct involving force or coercion; (3) aggravated domestic violence; or (4) unlawful imprisonment. Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

### A.        Criminal Sexual Conduct - First Degree

Pursuant to Michigan law in effect as of May 14, 2008, an individual was guilty of criminal sexual conduct in the first degree if he engaged in sexual penetration with another person

and if any of the following circumstances exists:

 (d) The actor is aided or abetted by 1 or more other persons and either of the following circumstances exists:

  (i) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

  (ii) The actor uses force or coercion to accomplish the sexual penetration. Force or coercion includes, but is not limited to, any of the circumstances listed in subdivision (f).

 (f) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration. Force or coercion includes but is not limited to any of the following circumstances:

  (i) When the actor overcomes the victim through the actual application of physical force or physical violence.

  (ii) When the actor coerces the victim to submit by threatening to use force or violence on the victim, and the victim believes that the actor has the present ability to execute these threats.

  (iii) When the actor coerces the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat. As used in this subdivision, "to retaliate" includes threats of physical punishment, kidnapping, or extortion.

  (iv) When the actor engages in the medical treatment or examination of the victim in a manner or for purposes which are medically recognized as unethical or unacceptable.

  (v) When the actor, through concealment or by the element of surprise, is able to overcome the victim.

Mich. Comp. Laws § 750.520b(1)(2008).

  Force or coercion "is not limited to physical violence but is instead determined in light of all the circumstances." *People v. Brown*, 495 N.W.2d 812, 813 (Mich. Ct. App. 1992). Moreover, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can

constitute satisfactory proof of the elements of a crime." *See People v. Pierce*, 2008 WL 2038355 at *5 (Mich. Ct. App., May 13, 2008) (quoting *People v. Carines*, 597 N.W.2d 130 (Mich. 1999)).

To convict an individual as an aider and abetter the following elements must be established: (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement which aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid or encouragement. *See People v. Harrington*, 2008 WL 747084 at *8 (Mich. Ct. App., Mar. 20, 2008) (citing *People v. Turner*, 540 N.W.2d 728 (Mich. Ct. App. 1995)).

Dana Herman testified that Petitioner stated to her that he would not let her "get away" with the alleged theft of his money.  According to Herman, Petitioner then threatened to beat her if she did not comply with his demands.  Herman testified that Petitioner's demands included that she allow Roderick Marzette to sexually assault her.[2]  Herman's testimony was sufficient to establish that she was sexually penetrated by Marzette through the exercise of coercion by Petitioner. Moreover, Herman's testimony was sufficient to establish that Petitioner assisted in the commission of the assault with the intent that the assault occur.

Petitioner's argument is simply that the jury should have weighed the evidence differently and reached a different result.  As previously noted, however, the evidence must be viewed in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution.  Moreover, to the extent there exists conflicting evidence, the Court

---

[2]  The Court notes that Marzette pleaded guilty to at least one criminal offense as a result of his participation in this matter.  (Sentencing Transcript, July 23, 2009, 11-13).

must presume that the jury resolved any such conflicts in favor of the prosecution.  Petitioner is essentially asking this Court to re-weigh the evidence and substitute its judgment for that of the jury.  As previously noted, the Court is not permitted to so act.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim concluding that the evidence presented at trial "support[s] a finding that [Petitioner] assisted or encouraged Marzette's penetration [of Herman] through the use of force or coercion." *People v. Belcher*, 2010 WL 5383948 at *2 (Mich. Ct. App., Dec. 28, 2010).  In light of the authority above and the evidence of record, the Court concludes that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B.    Criminal Sexual Conduct - Third Degree

Pursuant to Michigan law in effect as of May 14, 2008, an individual was guilty of criminal sexual conduct in the third degree if he engaged in sexual penetration with another person and if any of the following circumstances exists:

> (b)    Force or coercion is used to accomplish the sexual penetration.  Force or coercion includes but is not limited to any of the circumstances [identified in the preceding section].

Mich. Comp. Laws § 750.520d (2008).

Dana Herman testified that Petitioner threatened her with force if she did not comply with his demands.  Herman further testified that Petitioner subsequently violated her with a beer bottle against her wishes and refused to stop after informing him that he was causing her pain.  This

18

evidence was sufficient to convict Petitioner of Third Degree Criminal Sexual Conduct. Again, Petitioner's argument is that the jury should have weighed the evidence differently and reached a different result. As discussed above, however, this argument does not advance Petitioner's cause.

The Michigan Court of Appeals rejected this claim on the ground that "[t]he act of putting a beer bottle in the victim's vagina is sexual penetration [under Michigan law] and [t]he same facts supporting a finding of force or coercion with respect to the first-degree CSC charge support the use of force or coercion with respect to the third-degree CSC charge." *Belcher*, 2010 WL 5383948 at *2. In light of the evidence and authority identified above, the Court finds that denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.     Aggravated Domestic Violence

Pursuant to Michigan law in effect as of May 14, 2008, an individual was guilty of aggravated domestic assault if he "assaults. . .an individual with whom he. . .has or has had a dating relationship. . .without a weapon and inflicts serious or aggravated injury upon that individual." Mich. Comp. Laws § 750.81a(2)(2008). A serious or aggravated injury is defined as "substantial bodily (physical) injury or injury that necessitated immediate medical treatment or caused disfigurement, impairment of health or impairment of any bodily part." *People v. Moses*, 2006 WL 2088439 at *1 (Mich. Ct. App., July 27, 2006) (quoting *People v. Brown*, 296 N.W.2d 121, 123 (Mich. Ct. App., May 20, 1980)).

19

Dana Herman testified that Petitioner, after subjecting her to sexual assault, physically assaulted her with an electrical cord and repeatedly beat her with a wire hanger. Shannon Brauning testified that her examination of Herman revealed scratches on her face, bruises on her neck and buttocks, and a laceration on her pelvis. Brauning further testified that Herman's injuries were consistent with her description of events.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim finding that the prosecution "presented sufficient evidence to support a finding beyond a reasonable doubt that defendant committed aggravated domestic assault." *Belcher*, 2010 WL 5383948 at *3. The Court finds that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

D.     Unlawful Imprisonment

Pursuant to Michigan law in effect as of May 14, 2008, an individual was guilty of unlawful imprisonment if he "knowingly restrains another person. . .to facilitate the commission of another felony. . ." Mich. Comp. Laws § 750.349b(1)(c)(2008). Restrain is defined as "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." Mich. Comp. Laws § 750.349b(3)(a)(2008). Moreover, the restraint in question "does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." Mich. Comp. Laws § 750.349b(3)(a) (2008).

20

Herman testified that after Petitioner lead her into McMurtry's house, Petitioner

locked the door and retained the key which, as Herman and McMurtry both indicated, was necessary

to unlock the door even from the inside.   Herman testified that she was scared and that Petitioner

threatened to beat her if she did not comply with his demands.   The Michigan Court of Appeals

concluded that:

> Based on these facts, the victim was restrained and her liberty to exit
> the house under the circumstances was restricted.  Viewed in a light
> most favorable to the prosecution, a reasonable jury could convict
> defendant beyond a reasonable doubt of unlawful imprisonment
> based on the restraint imposed on the victim and that defendant
> committed third-degree criminal sexual conduct on the victim while
> she was restrained.

*Belcher*, 2010 WL 5383948 at *3.

The decision by the Michigan Court of Appeals to reject this particular claim is

neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this decision was not based on an unreasonable determination of the facts in light of

the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be

granted.

## II.            Juror Misconduct

The Sixth and Fourteenth Amendments to the United States Constitution guarantee

to every criminal defendant the right to trial by an impartial jury.  *See Wolfe v. Brigano*, 232 F.3d

499, 501 (6th Cir. 2000).  Petitioner alleges that his right to a trial by an impartial jury was violated

when a juror stated to the prosecuting attorney, after the conclusion of Petitioner's trial, that

Petitioner had been "winking, smiling and waving at her" during the course of his trial.

21

Petitioner bears the burden to establish the existence of juror bias which caused him to suffer actual prejudice. *See Smith v. Phillips*, 455 U.S. 209, 215-17 (1982) (petitioner bears the burden to demonstrate that he suffered "actual bias" as a result of juror misconduct); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *Sheppard v. Bagley*, 657 F.3d 338, 348-49 (6th Cir. 2011) (Batchelder, J. concurring). First, the alleged conduct in question did not occur until after the conclusion of Petitioner's trial. Thus, it is difficult to discern how Petitioner was prejudiced by such. Furthermore, Petitioner's claim is based on nothing more than unsubstantiated speculation. Other than his assertions that he did not wink, smile, or wave at the juror in question, Petitioner offers no evidence to support his claim. The Michigan Court of Appeals rejected this claim as follows:

> defendant fails to cite to the record to support his claim that the described events took place. Nothing in the record verifies defendant's claims, and therefore, defendant has not met his burden of demonstrating the existence of a plain error affecting his substantial rights.

*Belcher*, 2010 WL 5383948 at *4.

The decision to deny this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.        Ineffective Assistance of Counsel

Finally, Petitioner asserts that he is entitled to habeas relief because he was denied the right to the effective assistance of trial counsel. Specifically, Petitioner asserts that his trial counsel improperly failed to bring to the attention of the trial court the alleged juror misconduct

discussed in the preceding section.  Petitioner also seems to assert, as explained below, additional claims that his trial counsel was ineffective.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.* (citations omitted).  As the *Premo* Court stated:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).


A.     Juror Misconduct[3]

Petitioner asserts that his trial counsel rendered deficient performance by failing to assert in the trial court his juror misconduct claim.  As discussed above, however, Petitioner's juror misconduct claim is without merit.  Thus, counsel did not render deficient performance by failing to assert such.  The Michigan Court of Appeals rejected this claim on the ground that "[n]o evidence exists in the record that supports a finding that defense counsel's representation fell below an objective standard of reasonableness."  *Belcher*, 2010 WL 5383948 at *4.  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.

---

[3]   While this particular claim for relief is not articulated in Petitioner's initial form petition, (dkt. #1), it was raised in state court below and is discussed in Petitioner's Reply Brief, (dkt. #32 at PageID#492).  The Court finds, therefore, that this claim has been raised and is properly before the Court.

Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B. Actual Innocence

In his initial form petition, Petitioner asserts that his trial counsel rendered deficient performance by failing to investigate his "claim of actual innocence" based on "exculpatory and scientific evidence." (Dkt. #1 at Page ID#9). Petitioner has failed, however, to pursue this claim in state court. A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Petitioner's failure to exhaust this claim notwithstanding, the Court can deny this claim on the merits. *See* 28 U.S.C. § 2254(b)(2) (a habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Petitioner faults his attorney for failing to procure DNA testing of a "lotion bottle" that Petitioner allegedly inserted into Dana Herman's vagina. (Dkt. #1 at Page ID#9). Petitioner argues that DNA testing of the lotion bottle would have revealed the absence of sperm thereby demonstrating his innocence. This claim is totally without merit. Dana Herman did not testify that Petitioner violated her with a lotion bottle. Herman testified that Petitioner violated her with a beer bottle on which DNA testing was conducted. Moreover, even had Herman testified that Petitioner violated her with a lotion bottle, an absence of sperm thereon hardly establishes Petitioner's innocence. In sum, there is absolutely nothing in the record to support Petitioner's claim that DNA examination of a lotion bottle would have established his innocence. Thus, Petitioner could not

possibly have been prejudiced by counsel's failure to request DNA testing of the lotion bottle in question.  Accordingly, this claim is rejected.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Belcher's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  February 6, 2015                     /s/ Ellen S. Carmody
                                           ELLEN S. CARMODY
                                           United States Magistrate Judge

26